IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


JASON S. PRICE,                     )
                                    )
               Plaintiff,    )    **CIVIL ACTION**
                                    )
v.                            )    No. 07-1354-MLB
                                    )
CITY OF WICHITA, et al.,      )
                                    )
               Defendants.   )


**MEMORANDUM AND ORDER**

## I.    Introduction

This case comes before the court on the following motions:

1) Defendant Conmed, Inc.'s motion for summary judgment (Doc. 167) and supporting memorandum (Doc. 168), plaintiff's response (Doc. 182) and Conmed's reply (Doc. 190);

2) Defendants Cayle Eurton, Curtis Jones and Sedgwick County's motion for summary judgment (Doc. 172) and supporting memorandum (Doc. 173), plaintiff's response (Doc. 187) and defendants' reply (Doc. 203);

3) Defendants Dallas Boone, Jeffrey Gilmore, John Hoofer, Latavia Klumpp and the City of Wichita, Kansas' motion for summary judgment (Doc. 175) and supporting memorandum (Doc. 176), plaintiff's response (Doc. 198) and defendants' reply (Doc. 204); and

4) Plaintiff's motion for leave to file authenticating affidavits (Doc. 205) and supporting memorandum (Doc. 206) and

defendant Sedgwick County's response (Doc. 210).[1]

## II.   **Facts**[2]

On September 2, 2006, at approximately 3:00 in the morning, plaintiff and his friends were gathered in a Quik Trip parking lot in Wichita, Kansas.   An unknown individual called the police and requested that the parking lot be cleared.   Defendants Boone, Gilmore, Hoofer and Klumpp, all officers of the Wichita Police Department, arrived at the Quik Trip at approximately 3:24 a.m.   The officers arrested Kerry Rogers, plaintiff's friend.   Plaintiff spoke with both Klumpp and Hoofer in an attempt to learn why his friend had been arrested.   Plaintiff was basically told that Rogers' arrest was none of his business.   Plaintiff turned to his friends who instructed him to "be cool."   Plaintiff's response was "fuck the police, fuck them." Plaintiff then walked towards the front passenger side of a vehicle.

---

[1]   In this motion, plaintiff moves for leave to file authenticating affidavits for his experts Dr. Bruce Thomas and Edward Leach.   The Sedgwick County defendants are the only parties who object to the motion.   The main basis for their objection is the timeliness of the motion and an argument that Dr. Thomas' opinion does not support the conclusion that a material issue of fact remains as to the causation issue of plaintiff's negligence claim.   Defendants, however, have not claimed that they are in any way prejudiced by the filing of the authenticating affidavits.   Defendants have been aware of and deposed plaintiffs' experts.   Therefore, because the court finds that the delayed authentication of the exhibits has not caused any prejudice plaintiff's motion is granted.   (Doc. 205).

[2]   The following facts are either uncontroverted or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiff.   See Hall v. United Parcel Serv., No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)).   To the extent relevant, the factual disagreements between the parties will be noted.

Plaintiff walked past Hoofer[3] and Hoofer grabbed plaintiff's arm and pushed plaintiff over the trunk of the vehicle. As a result, plaintiff's impact broke the antenna of the vehicle and his lip was bleeding.[4] Plaintiff also alleges that the force of the impact caused internal bleeding. Plaintiff was then placed under arrest for battery of a law enforcement officer.

Plaintiff told Hoofer that he could not walk to the patrol car because his stomach was hurting. This was the only occasion that plaintiff disclosed stomach pain while in the presence of Boone, Gilmore, Hoofer and Klumpp. Hoofer and Klumpp physically carried and dragged plaintiff to a patrol car. Plaintiff was laid inside the patrol car on his stomach with his legs up on the seat. Plaintiff attempted to maneuver his body so that he was laying on his back. Once he had changed to that position, plaintiff kicked the car door because he was angry. Plaintiff asserts that both Hoofer and Boone opened the door, grabbed plaintiff's arms to adjust him so that they could remove him from the vehicle and essentially tossed him onto the ground. Plaintiff did not have the ability to catch himself because of his handcuffs. Gilmore than held plaintiff's ankles down and Boone placed his knee on plaintiff's back. Plaintiff was placed in leg shackles.

Plaintiff was then returned to the back of the patrol car with

---

[3] Hoofer testified that plaintiff's hands were in plaintiff's crotch area and plaintiff bumped into Hoofer's arm in close proximity to Hoofer's service weapon. Plaintiff, and other individuals, testified that plaintiff did not physically touch Hoofer.

[4] Hoofer directed Boone to take a photograph of both the broken antenna on the vehicle and of plaintiff. The photograph of plaintiff, however, is missing.

Kerry Rogers.  Boone and Klumpp transported plaintiff to the jail.
During the transport, plaintiff told Rogers, his friend, that he was
"fucked up and hurting."  Plaintiff claims that he blacked out from
pain in the back of the patrol car.  With the exception of plaintiff's
lip, plaintiff did not have any other visible injuries.  Plaintiff did
not directly speak to nor did he request medical attention from Boone
and Klumpp during the transport.  Once they arrived at the jail,
plaintiff was able to walk on his own and only fell on one occasion
due to the leg shackles.

At the booking and detention center, Boone and Klumpp did not
inform Sedgwick County personnel or Conmed employees that plaintiff
was injured or needed medical care.[5]  Defendant Eurton, a corporal in
the Sheriff's Department, and defendant Jones, a "search" or
"processing" deputy, were both present and working in the booking area
at the time of plaintiff's arrival.  Boone completed a "triage" form
regarding plaintiff's health and signed it.  The triage form noted
that plaintiff did not have any "observable or complaints of medical
problems," or any "acute medical conditions or injury recently
sustained" that might require immediate evaluation.

Jones instructed plaintiff to stand against a wall and take off
his socks and shoes.[6]  Plaintiff needed assistance taking off his
socks because he was in too much pain to stand on one leg.  Plaintiff

---

[5] At approximately 5:56 a.m., Hoofer completed a use of force
form in which he indicated that plaintiff suffered an injury.  Gilmore
also signed this form in the capacity of Hoofer's supervisor.

[6] Jones does not remember the search but assumes that it was him
who conducted the search.  Neither Eurton or Jones specifically
remember plaintiff.

was then escorted to the booking desk and proceeded to answer questions posed by Eurton. Eurton prepared a booking report for plaintiff's intake. Eurton should have prepared a booking medical intake form but the form is missing from plaintiff's records.[7] Plaintiff's booking report states that his photo was not taken because plaintiff was "extremely drunk." Jones escorted plaintiff to a holding cell across from the booking desk. The jail's daily log notes that this was done because plaintiff was "extremely drunk." Plaintiff did not ask either Jones or Eurton for medical help.

According to the policies of the jail, a new inmate must be assessed by medical staff, which would be an employee of defendant Conmed, if he is incapacitated due to alcohol or injured. Inmates must not be accepted until they are determined to be medically acceptable by staff or have a release from a hospital. Plaintiff was not seen by the medical staff. Eurton testified that he thought plaintiff was drunk, but not to the point that plaintiff required a medical assessment. Jones testified that an individual who was too drunk to be photographed should usually be seen by medical personnel.

Once in his cell, plaintiff states that he began having extreme pain in his stomach. Plaintiff crawled on the floor and beat on the window. At approximately 6:00 a.m., an unknown black deputy walked by and plaintiff requested help and asked to be seen. The deputy smiled and continued to walk past plaintiff's cell. About fifteen minutes later, plaintiff was beating on the door and "screaming for help." Plaintiff testified that a white deputy walked over and told

---

[7] This form asks prisoners questions regarding medical conditions and whether they want medical care.

him to stop beating on the window. Plaintiff then told this unknown deputy that he needed help because he was in pain and his stomach was hurting. The unknown deputy responded by telling plaintiff to stop beating on the window or plaintiff would be placed in restraints. Plaintiff then laid on the floor in a ball. At some point, plaintiff vomited and urinated on himself but he did not inform a deputy. Jones' shift ended at 7:00 a.m. Eurton remained at the jail until 3:00 p.m.

Plaintiff was removed from his cell to be photographed at approximately 1:48. Before the mug shots were taken, plaintiff complained to an unknown male deputy[8] that he was in pain and having difficulty standing up. Plaintiff also asked for help. Plaintiff alleges that an unknown female nurse walked by and the male deputy told her that plaintiff was in pain and could barely stand up. Plaintiff did not speak to the nurse. The nurse allegedly looked at plaintiff and said that he was drunk and she was not going to help him. The deputy then proceeded to take plaintiff's photo and fingerprints. Plaintiff was then returned to his cell.

At approximately 5:00 p.m., plaintiff was released on bond. Plaintiff was picked up by his mother and brother. Plaintiff did not immediately go to the hospital because he did not have insurance. In the early morning hours of September 3, plaintiff was in severe pain and could not walk or lay down. Plaintiff's mother took him to Via Christi Regional Medical Center around 5:00 a.m. Plaintiff was

---

[8] Plaintiff believes the deputy may be Eurton based on looking at a photograph. Eurton, however, states that it was not him who took plaintiff's photograph.

diagnosed with a duodenal hematoma, pancreatic contusion, abdominal compartment syndrome, respiratory failure, an abdominal wound and malnutrition. Dr. Bruce Thomas performed an exploratory laparotomy and surgically repaired plaintiff's duodenal hematoma. Plaintiff remained in the hospital for approximately one month.

Dr. Thomas testified that plaintiff received his injuries as a result of blunt force trauma. Dr. Thomas opined that it takes a significant amount of force to injure the duodenum and pancreas because of the position of the organs in the body. Dr. Thomas further opined that the delay in treatment would be associated with increased complications and a protracted hospital stay.

On March 13, 2007, a bench trial was held on the charge of battery of a law enforcement officer. The judge found plaintiff not guilty. On November 15, 2007, plaintiff filed this action against defendants alleging violations of his civil rights and state tort claims. All defendants have moved for summary judgment.

## III. Summary Judgment Standards

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. Adamson v. Multi Community Diversified

Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## IV. Analysis

### A. 1983 Claims

When law enforcement officers abuse their power, suits against them allow those wronged an effective method of redress. See Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982)). Pursuant to 42 U.S.C. section 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 was enacted to provide protections to those persons wronged by the misuse of power. While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed. See Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995). To state a claim for relief in a section 1983 action, plaintiff must establish that he was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law. See Am. Mfr's. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). There is no dispute that

defendants were acting under color of state law.

### 1. Qualified Immunity

While section 1983 permits the possible vindication of a plaintiff's rights, non-meritorious suits exact a high cost upon society and law enforcement personnel. See Anderson, 483 U.S. at 638. Indeed, the Supreme Court and the Tenth Circuit have recognized these suits may unduly interfere with the discharge of discretionary duties due to the constant fear civil litigation and potential monetary damages. See Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982); Wilson v. Stock, 52 F.3d 1547, 1552 (10th Cir. 1995). "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1277 (10th Cir. 1998) (internal quotations omitted) (citing Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)).

In order to balance these competing interests, government officials performing discretionary duties are afforded qualified immunity shielding them from civil damages liability. Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed.2d 565 (2009). Qualified immunity protects these officials unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Id.; Baptiste v. J.C. Penney Co., Inc., 147 F.3d 1252, 1255 (10th Cir. 1998). The defense not only provides immunity from monetary liability, but perhaps more

importantly, from suit as well.[9]  See Horstkoetter, 159 F.3d at 1277.

When a defendant claims qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a constitutional right and (2) demonstrating the right allegedly violated was "clearly established" at the time the conduct occurred.  Pearson, 129 S. Ct. at 815-6.  As noted in Pearson, courts are no longer required to follow the two-step sequence mandated by Saucier v. Katz, 533 U.S. 194 (2001).  Id. at 818.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id.

If a plaintiff successfully thwarts a defendant's qualified immunity defense, the ordinary summary judgment burden returns to the defendant to show no material issues of fact remain that would defeat the claim of qualified immunity.  See Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir. 1996).  This standard requires a defendant to show there are no disputes of material fact as to whether his conduct was objectively reasonable in light of clearly established law and the information known to the defendant at the time.  See id.  Even if a plaintiff is able to withstand summary judgment, the defendant is nonetheless able to reassert the defense of qualified immunity at trial.  See Gossett v. Oklahoma Bd. of Regents for Langston

---

[9]    One of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be peculiarly disruptive of effective government." Anderson, 483 U.S. at 646 n.6.

*University*, 245 F.3d 1172, 1181 n.5 (10th Cir. 2001).

### a. Clearly Established Constitutional Right

The court will first determine whether the right at issue was sufficiently clear that defendants would have understood that their conduct violated a constitutional right that was clearly established at the time the alleged acts took place. See <u>Cruz v. City of Laramie</u>, 239 F.3d 1183, 1187 (10th Cir. 2001); <u>Watson v. University of Utah Med. Ctr.</u>, 75 F.3d 569, 577 (10th Cir. 1996). This standard, however, must be used in a particularized manner[10] because "[o]n a very general level, all constitutional rights are clearly established." <u>Horstkoetter</u>, 159 F.3d at 1278. Were this level of particularity not required, <u>Harlowe</u> "would be transformed from a guarantee of immunity into a rule of pleading," that would "destroy 'the balance that [Supreme Court] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" <u>Anderson</u>, 483 U.S. at 639-40 (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984)).

Defendants do not assert that the rights alleged to be violated were not clearly established at the time of plaintiff's arrest. After viewing the facts in the light most favorable to plaintiff, the court finds that plaintiff's allegations of excessive force, deliberate indifference to medical needs and false arrest, were all clearly

---

[10]    The Tenth Circuit "has held that for a right to be 'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." <u>Wilson v. Meeks</u>, 52 F.3d 1547, 1552 (10th Cir. 1995); <u>see also</u> <u>Cruz v. City of Laramie</u>, 239 F.3d 1183, 1187 (10th Cir. 2001); <u>Horstkoetter v. Department of Public Safety</u>, 159 F.3d 1265, 1278 (10th Cir. 1998).

established at the time of plaintiff's arrest. See Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed.2d 251 (1976)(The right to custodial medical care is clearly established); Casey v. City of Federal Heights, 509 F.3d 1278, 1281 (10th Cir. 2007)("when an officer's violation of the Fourth Amendment is particularly clear from Graham itself, we do not require a second decision with greater specificity to clearly establish the law"); Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000) (noting that law enforcement officers must have either a warrant or probable cause to lawfully arrest individuals); Warner v. Grand County, 57 F.3d 962, 968 (10th Cir. 1995) (stating that municipality may be liable when its policies or deliberate indifference to inadequate training results in constitutional violations).

### b. **Violation of Constitutional Right** – **Excessive Force**

To determine whether plaintiff has sufficiently shown the violation of a constitutional right at all, this court must determine whether plaintiff's allegations, if true, state a claim for a violation of a constitutional right. See Romero, 45 F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226, 231–32 (1991)). Determining whether a plaintiff has stated a claim for a constitutional violation is purely a legal question.[11]  See id. Despite the inevitable factual issues that become intertwined in the characterization of a plaintiff's precise constitutional claims, this court cannot avoid the legal issue by simply framing it as a factual

---

[11]  Similarly, whether the right was clearly established at the time the incident occurred is also a legal question. See Romero, 45 F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226, 231–32 (1991)).

question.  See Archer v. Sanchez, 933 F.2d 1526, 1530 n.7 (10th Cir. 1991).

The degree of physical coercion that law enforcement officers may use is not unlimited, however, and "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865 (1989).

> To determine whether the force used in a particular case is excessive "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989) (internal quotation marks omitted). The ultimate question "is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." Id. at 397, 109 S. Ct. 1865 (internal quotations marks omitted). This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S. Ct. 1865.

Casey v. City of Federal Heights, 509 F.3d 1278, 1281 (10th Cir. 2007); see also Dixon v. Richer, 922 F. 2d 1456, 1462 (10th Cir. 1991).

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" Thomas v. Durastanti, ---F.3d---, 2010 WL 2221317, *5 (10th Cir. June 4, 2010).  Plaintiff claims that both Hoofer and Boone violated plaintiff's right to be free from excessive force when Hoofer threw plaintiff on the trunk of the vehicle and the

subsequent act of both Hoofer and Boone pulling plaintiff out of the patrol car and allowing him to fall face down on the pavement. There is no dispute that plaintiff was seized under the Fourth Amendment at the initial encounter between plaintiff and Hoofer.

### Seizing of Plaintiff on the Trunk of the Vehicle

Hoofer asserts that the use of force used on plaintiff was reasonable due to a risk of officer safety. "When evaluating the reasonableness of force employed in seizure, [the court must] consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" Durastanti, 2010 WL 2221317, *6; see also Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009).

The first factor the court is to consider is the severity of the crime. Plaintiff was arrested for his battery of a law enforcement officer, which is a class A person misdemeanor under Kansas law. Kansas v. Perez-Moran, 276 Kan. 830, 838, 80 P.3d 361 (2003). A misdemeanor offense reduces the level of force that is reasonable for an officer to use. Casey, 509 F.3d at 1281. Moreover, Hoofer's testimony was that he was bumped by plaintiff. There was no allegation by Hoofer that plaintiff's conduct was aggressive. Further, plaintiff and other eyewitnesses claim that plaintiff did not physically touch Hoofer.

The second factor is whether plaintiff posed an immediate threat to the safety of officers. In viewing the evidence in the light most favorable to plaintiff, he did not pose a threat to the officers' safety. Plaintiff did not physically touch Hoofer. Moreover,

-14-

plaintiff was unarmed and not acting in a threatening manner.

Finally, the third factor requires the court to determine if plaintiff was resisting arrest or attempting to evade arrest by flight. Hoofer does not assert that plaintiff was resisting arrest. Importantly, Hoofer did not give plaintiff an opportunity to submit as he was never told he was under arrest. "This factor therefore also tilts the scale in the direction of unreasonable force." Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008)("[n]o police officer notified [Fogarty] that he was under arrest, nor did they ask him to come along peacefully.")

The court finds that there is a genuine dispute as to whether the use of force used by Hoofer was reasonable. In addition to the factors discussed above, plaintiff may have suffered significant injuries as a result of the force. See Herrera v. Bernalillo County Bd. of County Com'rs, No. 09-2042, 2010 WL 226571, 3 (10th Cir. Jan. 20, 2010)(genuine question as to whether the use of force was reasonable after the plaintiff did not resist arrest and the force was sufficient enough to tear ligaments in his knee); Serna v. Colo. Dep't. of Corrections, No. 04-1003, 2004 WL 1842991, (10th Cir. Aug. 18, 2004)(upheld denial of summary judgment to officers after determining a dispute existed as to whether the significant injuries suffered by the plaintiff were a result of the seizure in the plaintiff's cell).

### The Forced Removal of Plaintiff out of the Patrol Car

The second violation of his right to be free from excessive force comes from the removal of plaintiff from the patrol car which caused him to fall face first on the ground. The facts concerning

this incident, viewed in a light favorable to plaintiff, are that plaintiff was placed in the patrol vehicle on his stomach with his legs also on the seat. Plaintiff then shifted so that he was laying on his back. Plaintiff attempted to maneuver himself to a different position and then purposefully kicked the window with one foot. The window kick resulted in immediate action from Boone and Hoofer. The officers opened the car door and raised plaintiff to a sitting position. Plaintiff was silent at this time and did not protest. Boone and Hoofer, without first giving any type of verbal command to plaintiff, heaved plaintiff out of the patrol car and onto the ground. Boone then placed his knee on plaintiff's back to keep plaintiff on the ground. While plaintiff was on the ground he was screaming that he was in pain. Plaintiff was also questioning the officers' conduct in forcefully removing him from the car.

While the court believes that a jury could find the act of removing plaintiff from the car to place leg shackles on plaintiff's ankles was reasonable, the court finds that a reasonable jury could determine that the amount of force used to remove plaintiff from the car and hold him down by placing a knee in his back was constitutionally unreasonable especially in light of plaintiff's protest that he was in pain and the initial force used on his abdomen area. See Buck v. City of Albuquerque, 549 F.3d 1269, 1290 (10th Cir. 2008)(denying qualified immunity when "the officers grabbed him, dragged him, and pushed him face down on the pavement. One officer kneed him in the back and pinned him to the ground. An officer pushed him face forward onto the roof of a police car, and he was exposed to tear gas while handcuffed in the car.")

Therefore, Hoofer and Boone's motion for summary judgment as to the excessive force claims is denied.

### c. Violation of a Constitutional Right - False Arrest

Plaintiff's second claim against Hoofer is that he violated his Fourth Amendment right by arresting him without probable cause. When a warrantless arrest is the basis for a 1983 claim, a plaintiff must show that the defendant officer lacked probable cause. Buck v. City of Albuquerque, 549 F.3d 1269, 1281 (10th Cir. 2008). "An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee." Oliver, 209 F.3d at 1186. Probable cause exists if "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Fogarty v. Gallegos, 523 F.3d 1147, 1156 (10th Cir. 2008) (quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001)).

Under Kansas law, a warrantless arrest for a misdemeanor may be made when the officer has probable cause to believe that a person is committing or has committed a misdemeanor and also has probable cause to believe that:

> (A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;
>
> (B) the person may cause injury to self or others or damage to property unless immediately arrested; or
>
> (C) the person has intentionally inflicted bodily harm to another person.

K.S.A. 22-2401. It is unclear which, if any, of these bases were relied upon by Hoofer, but nevertheless, the fact that plaintiff's arrest may have violated Kansas law does not translate to a Fourth Amendment violation. See United States v. Fisher, 241 F. Supp. 2d. 1154, 1160-63 (D. Kan. 2002).

In the context of section 1983 claims, an officer is entitled to qualified immunity for a warrantless arrest when a reasonable officer would believe probable cause exists based upon the circumstances known at the time of the arrest. Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). The operative words, of course, are "reasonably but mistakenly."

It is undisputed that Hoofer arrested plaintiff without a warrant. Plaintiff asserts that Hoofer lacked probable cause as well. Hoofer takes the position that there was probable cause to arrest plaintiff for battery of a law enforcement officer, a misdemeanor under Kansas law, which provides, in pertinent part: "Any person who, within the corporate limits of the city, intentionally causes physical contact with a uniformed or properly identified state, county or city law enforcement officer while such officer is engaged in the performance of such officer's duty, in a rude, insolent or angry manner, is guilty of a misdemeanor." Wichita Municipal Code § 5.10.035(a).

As previously discussed, there is a dispute as to whether plaintiff physically came into contact with Hoofer at the time he was

-18-

seized. Moreover, plaintiff's only statements arguably made in anger were "fuck the police." These comments were directed towards his friends and there is no evidence to support that plaintiff was directing the comments towards any specific officer.

Viewed in the light most favorable to plaintiff, the court finds that plaintiff has met his burden to show that a genuine issue of material fact exists as to whether there was probable cause to arrest him and whether an objectively reasonable officer would mistakenly believe that probable cause exists. See Buck, 549 F.3d at 1281 ("In general, 'it is a jury question in a civil rights suit whether an officer had probable cause to arrest.'"); See also Bruner v. Baker, 506 F.3d 1021, 1028 (10th Cir. 2007) ("[W]here there is a question of fact or 'room for a difference of opinion' about the existence of probable cause, it is a proper question for a jury[.]").

Therefore, Hoofer's motion for summary judgment on plaintiff's Fourth Amendment claim of false arrest is denied.

### d. Constitutional Violation - Deliberate Indifference
### Individual Defendants

Plaintiff asserts that Wichita police offers Hoofer, Boone, Gilmore, and Klumpp and Sedgwick County Sheriff's deputies Jones and Eurton violated his Fourteenth Amendment right to receive medical attention while a pretrial detainee. A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he "allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed.2d 251 (1976). Although "[p]retrial detainees are protected under the Due Process Clause

-19-

rather than the Eighth Amendment, . . . this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." Lopez v. LeMaster, 172 F.3d 756, 759 n. 2 (10th Cir. 1999).

Deliberate indifference to a prisoner's serious medical needs encompasses two components. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005) (citing Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)). First, there is an objective component, which requires that the medical need be sufficiently serious. Id.

> We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Sealock, 218 F.3d at 1209 (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (further quotation omitted)). Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. See, e.g., Green v. Branson, 108 F.3d 1296, 1303 (10th Cir. 1997). Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001).

Id.

As to this component, plaintiff asserts that the harm is the duodenal hematoma and pancreatic contusion that he suffered as a result of the excessive force of Hoofer and Boone. Due to the serious nature of this injury and plaintiff's extensive hospital stay, the court finds that plaintiff has stated a serious medical need.

Defendants Hoofer and Boone argue that the objective prong is not satisfied unless a delay in medical care resulted in substantial harm. (Doc. 176 at 18). "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993). Substantial harm is satisfied if there was considerable pain associated with the delay. Oxendine v. Kaplan, 241 F.3d 1272, 1278 (10th Cir. 2001) ("[T]he delay . . . caused substantial harm due to the fact that . . . Oxendine experienced considerable pain.") Plaintiff has testified that he experienced significant pain while he was in his cell. Plaintiff was crawling on the floor, curled up in a ball, vomiting and urinating on himself while he was detained at the jail. The court finds that the facts viewed in a light most favorable to plaintiff establish that the objective prong has been satisfied.

The second part of the deliberate indifference test involves a subjective component. The question is whether the defendant had a sufficiently culpable state of mind. Mata, 427 F.3d at 751 (citing Estelle, 429 U.S. at 106, 97 S. Ct. 285).

> The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference."

Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L. Ed. 2d 811 (1994)).

In order to satisfy the subjective standard, plaintiff must show that defendants were deliberately indifferent to the specific risk of

his internal injuries.  Martinez v. Beggs, 563 F.3d 1082, 1089 (10th Cir. 2009).  The court will now specifically address each individual defendant.

### Hoofer

Plaintiff contends that Hoofer knew of his injury because 1) Hoofer was the individual who inflicted the injury; 2) plaintiff told Hoofer that he could not walk because he was in pain; 3) Hoofer checked a box on the use of force form that stated plaintiff suffered an injury; 4) Hoofer had to drag plaintiff to the patrol car; 5) there was blood pooled on the back of the car; 6) the impact of plaintiff's injury to the back of the car caused a loud sound; and 7) the antenna broke when plaintiff was slammed on the back of the car.  (Doc. 198 at 23-24).

The evidence viewed in light most favorable to plaintiff, however, still does not establish that Hoofer knew of and disregarded the risk of internal injury.  While there was blood visible on the patrol car and the antenna was broken, those facts support the knowledge of plaintiff's injury to his face.  Plaintiff's argument regarding his facial injuries are not persuasive because that is not the harm that plaintiff is alleging occurred as a result of the failure to receive medical care.  Martinez, 563 F.3d at 1089.  As to his internal injuries, there was no visible signs of injury to his abdomen.  Plaintiff also never requested any medical care from Hoofer. See Vaughn v. City of Lebanon, No. 99-6670, 2001 WL 966279, 19 (6th Cir. Aug. 16, 2001).  In Vaughn, the plaintiff was injured after being sprayed with pepper spray.  The plaintiff had a severe reaction to the spray which resulted in an injury.  The court determined, however,

-22-

that the officers were not deliberately indifferent to his need for medical care because his claim of injury occurred directly after the spray and he never asked for medical care. The court reasoned that the plaintiff's complaints immediately after the spray were common with regular reactions to being sprayed. Similar to <u>Vaughn</u>, plaintiff's only express implication of pain to Hoofer occurred directly after the injury and plaintiff never asked for medical attention. Plaintiff's statement of pain immediately after the incident would be a normal reaction from someone who was forcefully thrown against a car. It does not support a finding, however, that Hoofer would make the assumption that the impact caused internal injuries.

The court finds that Hoofer did not have knowledge of plaintiff's risk of internal injury. Therefore, Hoofer is entitled to qualified immunity on plaintiff's claim of deliberate indifference.

### **Boone, Gilmore and Klumpp**

Plaintiff essentially makes the same argument regarding the remaining officers' knowledge of his injuries. Significantly, plaintiff never asked any officer for medical treatment. Boone and Klumpp may have overheard plaintiff tell Rogers in the patrol car that he was "fucked up" but that does not demonstrate that those officers had knowledge and were aware that there was a significant risk of internal injuries. Plaintiff did not specifically state what injuries he was suffering or his need for medical care while he was being transported to the jail. Therefore, Boone, Gilmore and Klumpp are also entitled to summary judgment on plaintiff's claim of deliberate indifference.

**Jones and Eurton**

Defendants Jones and Eurton claim that they cannot be liable for deliberate indifference because there is no evidence that plaintiff sought medical care directly from them. Jones and Eurton, however, do not address a large portion of plaintiff's version of the facts. Plaintiff asserts that in addition to specifically speaking to three different deputies, he also repeatedly yelled for help, was banging on the cell door, screaming that his stomach hurt and that he was in pain. Plaintiff also alleges that he was crawling around the floor due to pain and curled up in a ball. These facts are more significant given the location of plaintiff's cell was directly in front of the booking desk. Moreover, plaintiff alleges that at some point he vomited and urinated on himself in the cell.

In addition to these facts, plaintiff also infers that his records were somehow manipulated because the medical form that is required to be completed for all inmates is missing from his file. This form would have required the deputies to ask plaintiff if he wanted medical attention. Moreover, plaintiff also attempts to argue that the failure to take his photo when he first arrived at the jail is also suspicious. While the jail's records claim that plaintiff was intoxicated, plaintiff denies this allegation.

After viewing the facts in the light most favorable to plaintiff, the court finds that disputed facts exist as to whether Jones and Eurton were aware of and deliberately ignored the risk of plaintiff's internal injuries. See Farhat v. Young, No. 08-6159, 2009 WL 2733228, 2 (10th Cir. Aug. 28, 2009)(summary judgment denied when plaintiff alleged that he was ignored after yelling for food and

water).

## City of Wichita

Defendant City asserts that it cannot be liable for deliberate indifference when its officers have not committed a constitutional violation. It is correct. A municipality is not liable for constitutional violations "when there was no underlying constitutional violation by any of its officers." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317 (10th Cir. 2002). Therefore, the City's motion for summary judgment on plaintiff's claim of deliberate indifference is granted.

## Sedgwick County

Plaintiff contends that Sedgwick County is liable for the failure to train its deputies to determine whether an inmate has needs medical attention. A county may be liable for deliberate indifference to medical needs when the failure to train causes a constitutional violation. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317-18 (10th Cir. 2002).

> In the absence of an explicit policy or an entrenched custom, "the inadequacy of police training may serve as a basis of § 1983 liability ... where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact."
>
> Indeed, we have confirmed that this deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1999). Although a single incident generally will not give rise to liability, Okla. City v. Tuttle, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed.2d 791 (1985), "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious'

consequence of a municipality's action." <u>Barney</u>, 143 F.3d at 1307 (internal citations omitted). The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S. 397, 399, 117 S. Ct. 1382, 137 L. Ed.2d 626 (1997). That is, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" <u>City of Canton</u>, 489 U.S. at 391, 109 S. Ct. 1197. With regard to any attempted showing of "deliberate indifference" by a municipality, the existence of "material issues of material fact preclude[s] summary judgment." <u>Cruz v. City of Laramie</u>, 239 F.3d 1183, 1191 (10th Cir. 2001).

<u>Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1317-18 (10th Cir. 2002)(internal citations omitted).

Plaintiff contends that every inmate must be screened to determine if medical attention is necessary prior to acceptance into the jail. General Order 107II(B) requires a medical release or assessment by the medical clinic for individuals who have signs of head injuries, any type of serious injury or signs of possible internal bleeding. Eurton testified that the deputies are not medically trained for their positions. They are also not trained on the signs or symptoms of internal bleeding, abdominal or head injuries. Sedgwick County argues that it is not required to medically train its deputies because it has contracted with Conmed to provide medical services.

Plaintiff does not allege that other individuals have suffered a violation of their constitutional rights by the County's failure to train deputies to be aware of certain medical issues. Therefore, Sedgwick County is only liable if plaintiff has established that "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action," <u>Olsen</u>, 312 F.3d at

1317, "such as when a municipality fails to train an employee in specific skills needed to handle recurring situations." Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998). Plaintiff has failed to establish that plaintiff's situation is a recurring one and that the failure to train will result in a violation of federal rights that is plainly obvious. The County, in an attempt to determine medical needs, requires the deputies to complete a medical intake form. While that was not performed in this case, there is no evidence that the absence of the form is a repeated practice at the jail. When the form is used, it asks questions of the inmate in order to determine medical need. That form is then reviewed by the contract nurses. The implementation of this process by the County supports a finding that the County is not deliberately indifferent to the medical needs of its inmates. Without any evidence to support a finding that the County had knowledge that its policies were not being followed, plaintiff is unable to establish that the County is liable for the constitutional violation in this case.

Defendant Sedgwick County's motion for summary judgment on plaintiff's claim of deliberate indifference is granted.

### Conmed

Initially, Conmed argues that it should be afforded qualified immunity because it is a private contractor performing a government function. Conmed cites to DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714 (10th Cir. 1988) to support its position. That case, however, is no longer the controlling authority after the Supreme Court's opinion in Richardson v. McKnight, 521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed.2d 540 (1997). In Richardson, the Supreme Court held

that prison guards employed by a private prison management firm were not entitled to qualified immunity. 521 U.S. at 413. The Court specifically noted that its holding "d[id] not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." Eden v. Voss, No. 03-2030, 105 Fed. Appx. 234, 241-42 (10th Cir. July 9, 2004)(quoting Richardson, 521 U.S. at 413). Therefore, the court must first determine whether qualified immunity applies to Conmed.

Conmed, however, did not address the Richardson opinion in its opening brief or reply even though plaintiff thoroughly discussed the opinion. Conmed also did not discuss Tenth Circuit decisions which identify factors relevant to determining whether qualified immunity is applicable. See Eden, 105 Fed. Appx. at 242; Rosewood Servs., Inc., v. Sunflower Diversified Servs., Inc., 413 F.3d 1163 (10th Cir. 2005). In light of the absence of any evidence that Conmed was "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision," the court is unable to find that Conmed is entitled to qualified immunity. Richardson, 521 U.S. at 413.

Conmed, however, may still be entitled to summary judgment on plaintiff's section 1983 claim of deliberate indifference. Claims against private actors may proceed under section 1983 if (1) the plaintiff was deprived of a federal right by (2) an individual acting under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed.2d 572 (1980). Where a plaintiff seeks to hold a private corporation responsible for the actions of its employee -

as is the case here - the plaintiff must also demonstrate that the employee acted pursuant to a custom or policy of the corporation.  <u>See</u> <u>Monell v. Dep't of Soc. Servs. of New York</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978); <u>Sanders v. Sears, Roebuck & Co.</u>, 984 F.2d 972, 975-76 (8th Cir. 1993); <u>Iskander v. Forest Park</u>, 690 F.2d 126, 128 (7th Cir. 1982); <u>Powell v. Shopco Laurel Co.</u>, 678 F.2d 504, 505-06 (4th Cir. 1982).  This is so because "[s]ection 1983 will not support a claim based on a respondeat superior theory of liability." <u>Polk Co. v. Dodson</u>, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed.2d 509 (1981).  "[W]hether there is a direct causal link between a [] policy and the alleged constitutional deprivation" is the "first inquiry" in a section 1983 claim against a private corporation.  <u>Canton</u>, 489 U.S. at 385.

Conmed agrees, for the purposes of this motion, that its employee was acting under color of state law.  Plaintiff contends that Conmed's policy of discouraging medical care to prisoners was the direct cause of the violation of his constitutional rights.  Conmed, however, asserts that plaintiff has not established that the "policy" is the reason that its employee refused to treat plaintiff.  At this stage in the proceedings, the court must view all facts in the light most favorable to plaintiff.  A nurse previously employed by Conmed during the time period of plaintiff's incarceration testified that Conmed discourages the nurses from providing medical care to prisoners in order to keep costs down.  Plaintiff claims that he told a deputy of his stomach pain and that deputy in turn told a nurse that plaintiff was in pain and needed attention.  The nurse supposedly responded that plaintiff was just drunk and she was not going to treat

him.  The nurse, however, did not attempt to verify the nature of plaintiff's injury but instead remained several feet away from plaintiff during this encounter.  The court finds that these facts establish a dispute as to whether the reason for inaction was Conmed's policy of discouraging treatment to prisoners.

When a plaintiff alleges that a policy compromised a failure to act, he must demonstrate that the inaction resulted in deliberate indifference to plaintiff's rights.  <u>Jenkins v. Wood</u>, 81 F.3d 988, 994 (10th Cir. 1996).  As previously determined, plaintiff's injury met the objective component of the deliberate indifference standard because it was a serious medical need and the delay in treatment caused significant pain and a potential for a more protracted recovery.  As to the subjective component, the court must determine if Conmed's nurse knew of and disregarded an excessive risk to plaintiff's health or safety.  The facts, viewed in a light most favorable to plaintiff, establish that a deputy asked a Conmed nurse to treat plaintiff because he was complaining of stomach pain.  The nurse refused to provide treatment.  The court finds that these facts are sufficient to establish that a genuine dispute of material fact exists as to whether Conmed acted with deliberate indifference by refusing to treat plaintiff.

Conmed's motion for summary judgment on plaintiff's claim of deliberate indifference is denied.

### B.  State Law Intentional Tort Claims

The City defendants claim qualified immunity for all state law tort claims raised in the pretrial order.  Under the Kansas Tort Claims Act, a governmental entity or employee is not liable for

damages from enforcement of a law. <u>Nielander v. Bd. of County Comm'rs of County of Republic, Kan.</u>, 582 F.3d 1155, 1170 (10th Cir. 2009). However, "government employees are not entitled to immunity for willful or intentional actions." <u>Id.</u> In their motion, the City defendants reiterate the arguments that there was probable cause for the arrest and the amount of force used by the officers was not excessive. The court has determined, however, that those issues are disputed. Therefore, for those same reasons, the court cannot find that the officers and the City are entitled to qualified immunity.

Because the City defendants only basis for summary judgment on plaintiff's claims of false arrest, malicious prosecution, excessive force, assault, battery and intentional infliction of emotional distress is immunity, their motion must be denied. The City defendants have failed to establish that there is no disputed facts from which a reasonable jury could find in favor of plaintiff on those claims.

### C. Negligence in Obtaining Medical Care - All Defendants[12]

To bring an actionable claim for negligence under Kansas law, plaintiff must show (1) that defendant owed a duty of care, (2) that defendant breached that duty, and (3) that defendant's breach injured plaintiff. <u>See</u> <u>Gilger v. Lee Constr., Inc.</u>, 249 Kan. 307, 322, 820 P.2d 390, 400 (1991). The existence of a duty is a question of law. <u>See</u> <u>Burney v. Kansas Dep't of Soc. and Rehab. Servs.</u>, 23 Kan. App.2d 394, 931 P.2d 26, 29 (1997). Expert testimony is required in medical

---

[12] The City defendants do not address the negligence claim against them. Therefore, the court denies their motion for summary judgment on that claim.

malpractice cases to establish the applicable standard of care and to prove causation. Schmidt v. Shearer, 26 Kan. App.2d 760, 764, 995 P.2d 381 (1999). If a duty exists, breach and causation are questions for the fact finder. See Melvin v. U.S., 963 F. Supp. 1052, 1059 (D. Kan. 1997) (citing Calwell v. Hassan, 253 Kan. 567, 571, 925 P .2d 422, 428 (1996)).

Defendants have a duty to provide medical attention to the individuals in their custody. See Thomas v. County Comm'rs of Shawnee County, 40 Kan. App.2d 946, 955 (2008); Cansler v. Kansas, 234 Kan. 554, 560-65, 675 P.2d 57 (1984); Griffin v. United States, No. 00-4017, 2000 WL 33200259, *5 (D. Kan. Oct. 16, 2000). Both Sedgwick County defendants and Conmed assert that summary judgment is proper on this claim because plaintiff has failed to show that their actions caused any injury. They argue that the injury was caused by the City defendants and that plaintiff has failed to establish any additional harm or injury due to the delay in treatment.

Plaintiff's expert, Dr. Bruce Thomas, has offered the following opinion with respect to the delay of treatment: "Mr. Price would most likely have suffered fewer complications and a less protracted hospital course had he been evaluated sooner after the injury. I cannot conjecture at what hour after the injury any delay became critical." (Doc. 187, exh. 1).[13]

---

[13] Plaintiff also asserts that defendants are liable because the delay caused him significant pain. Plaintiff, however, uses the standard set forth in section 1983 claims for deliberate indifference. See Beers v. Ballard, No. 06-5104, 2007 WL 2827704 (10th Cir. Oct. 1, 2007)(discussing delay of treatment with respect to section 1983 deliberate indifference claims). With respect to his state law medical negligence claim, plaintiff must establish his claim under Kansas law.

In <u>Sharples v. Roberts</u>, 249 Kan. 286, 816 P.2d 390 (1991), the Kansas Supreme Court determined that the plaintiff had failed to establish causation because the expert could not state with medical certainty that the defendant's negligence in delayed testing was the proximate cause of the injury. The expert's opinion "was that it was possible some injury might have been avoided if the kidney stone had been discovered sooner but that he could not come to any 'firm conclusion' either way." 249 Kan. at 297.

The testimony of Dr. Thomas also falls "short of the degree of medical probability or certainty required to support the necessary element of causation" in this case. <u>Id.</u> Dr. Thomas opines that plaintiff most likely would have suffered fewer complications and a shorter hospital stay. Dr. Thomas, however, does not state with certainty the complications which resulted from the delay or the length of stay plaintiff would have endured had he been taken to the hospital while in the custody of Sedgwick County. Also, Dr. Thomas cannot state with certainty the hour at which the delay became critical. Therefore, the court finds that plaintiff is unable to establish the critical element of causation as to his medical negligence claim.

Alternatively, plaintiff asserts that he can proceed on his claim under the common knowledge exception. "This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally." <u>Perkins v. Susan B. Allen Mem'l</u>

-33-

Hosp., 36 Kan. App. 2d 885, 888-889, 146 P.3d 1102, 1106 (2006). Plaintiff asserts that this exception applies because he was refused medical care and any layperson can assess the wrongfulness and lack of reasonable care for refusing to provide medical care.

The fatal flaw in plaintiff's rationale is that plaintiff still must establish that defendants' inactions resulted in his injury. A medical doctor cannot even opine within a reasonable degree of medical certainty that the delay caused a specific injury. How would an ordinary citizen make that determination? The common knowledge exception is clearly not applicable in this case and the cases in which it has been applied are not factually similar. See Schara v. Pleasant Valley Nursing, LLC, No. 07-1165, 2009 WL 2195107 (D. Kan. July 22, 2009)(failure to provide medical records fell within the exception because the doctor testified that he would have reviewed the records and continue to provide the same treatment to the plaintiff); McKnight v. St. Francis Hosp. & School of Nursing, 224 Kan. 632, 634-35, 585 P.2d 984 (1978) (applying exception when weakened patient fell onto the floor during an x-ray examination when the table was tilted vertically); Hiatt v. Groce, 215 Kan. 14, 523 P.2d 320 (1974) (applying exception when plaintiff's mother had experience as a midwife and testified concerning her own pregnancy); Karrigan v. Nazareth Convent & Acad., Inc., 212 Kan. 44, 51, 510 P.2d 190 (1973) (applying exception when nursing staff failed to attempt to contact doctor after initial attempt); Rule v. Cheeseman, Executrix, 181 Kan. 957, 963, 317 P.2d 472 (1957) (applying exception when sponge was left in patient after surgery); Bernsden v. Johnson, 174 Kan. 230, 236-37, 255 P.2d 1033 (1953) (applying exception when post-surgery choking was

-34-

caused by metal disc lodged in patient's throat); <u>Schwartz v. Abay</u>, 26 Kan. App. 2d 707, 995 P.2d 878 (1999) (applying exception where surgeon removed 60% of the wrong vertebral disc).

Therefore, Sedgwick County defendants and Conmed's motions for summary judgment on plaintiff's negligence claim is granted.

### D. Punitive Damages

Finally, Conmed asserts that plaintiff's claims for punitive damages fail to state a claim. The only remaining claim against Conmed is the section 1983 deliberate indifference claim. Conmed asserts that punitive damages are unavailable because "plaintiff lacks evidence to prove that Conmed: 1) violated his 14th Amendment rights via an unconstitutional policy or custom that was the "direct cause" or "moving force" behind the deprivation of rights and injuries; and/or 2) acted with deliberate or callous indifference, evil motive or intent in refusing him a medical assessment. As such, punitive damages are not recoverable relative to plaintiff's 14th Amendment claim." (Doc. 168 at 30).

Because the court has determined that issues of disputed fact exist as to whether Conmed's supposed policy of discouraging treatment of prisoners was the direct cause of plaintiff's injury and Conmed's employee acted with deliberate indifference, Conmed's motion for summary judgment on plaintiff's punitive damages claim is denied.

## V. Conclusion

Defendant Conmed, Inc.'s motion for summary judgment (Doc. 167) is granted in part and denied in part. Defendants Cayle Eurton, Curtis Jones and Sedgwick County's motion for summary judgment (Doc. 172) is granted in part and denied in part. Defendants Dallas Boone,

Jeffrey Gilmore, John Hoofer, Latavia Klumpp and the City of Wichita, Kansas' motion for summary judgment (Doc. 175) is granted in part and denied in part. Plaintiff's motion for leave to file authenticating affidavits (Doc. 205) is granted. The clerk is ordered to set this case for trial. On or before August 27, 2010, the parties are directed to prepare and submit an amended pretrial order which reflects the rulings herein, requested jury instructions and requested voir dire questions. A status conference will be held approximately 2-3 weeks prior to trial.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this ___12th___ day of August 2010, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE